UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CARGO AGENTS, INC., on behalf of itself and all others similarly situated, | ) )<br>) **13 CV 7216** |
| Plaintiff, | ) Civil Action No. |
| -against- | ) **CLASS ACTION** |
| | ) **COMPLAINT and DEMAND** |
| NIPPON YUSEN KABUSHIKI KAISHA, NYK LINE (NORTH AMERICA), INC., MITSUI O.S.K. LINES, LTD., MITSUI O.S.K. BULK SHIPPING (USA), INC., KAWASAKI KISEN KAISHA LTD., "K" LINE AMERICA, INC., EUKOR CAR CARRIERS INC., WALLENIUS WILHELMSEN LOGISTICS ASA, WALLENIUS WILHELMSEN LOGISTICS AMERICAS LLC, WALLENIUS LINES AB, WILH. WILHELMSEN HOLDING ASA, WILH. WILHELMSEN ASA, COMPANIA SUD AMERICANA DE VAPORES S.A., CSAV AGENCY NORTH AMERICA, LLC, TOYOFUJI SHIPPING CO., LTD., and NISSAN MOTOR CAR CARRIER CO.,LTD., | ) **FOR TRIAL BY JURY** ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

RECEIVED
OCT 11 2013
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Cargo Agents, Inc., on behalf of itself and a class of all persons and entities that purchased Vehicle Carrier Services to and from the United States directly from any Defendant at any time from January 1, 2006 to the present, brings this class action for treble damages, injunctive relief and other relief, including the costs of suit and reasonable attorneys' fees, for injuries resulting from Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Plaintiff makes these allegations based upon its own knowledge as to the facts pertaining to itself and upon information and belief as to all other matters, and based on the investigation of counsel.

## I.   NATURE OF THE ACTION

1.      The Defendants are the major providers of Vehicle Carrier Service globally to and

from the United States and include:  Nippon Yusen Kabushiki Kaisha, NYK Line (North America)

Inc., Mitsui O.S.K. Lines, Ltd., Mitsui O.S.K. Bulk Shipping (USA), Inc., Kawasaki Kisen Kaisha,

Ltd., "K" Line America, Inc., EUKOR Car Carriers Inc., Wilh. Wilhelmsen Holding ASA, Wilh.

Wilhelmsen ASA, Wallenius Lines AB, Wallenius Wilhelmsen Logistics ASA, Wallenius Wilhelmsen

Logistics Americas, LLC, Compañia Sud Americana de Vapores S.A., CSAV Agency North America,

LLC,  Toyofuji Shipping Co., Ltd., and Nissan Motor Car Carrier Co., Ltd.

2.      "Vehicle Carriers" are large specialized ocean shipping vessels that transport

wheeled freight, such as cars, trucks, busses, etc., and can be rolled on and off of a ship. These

vessels are known as roll on, roll off cargo ships. "Vehicle Carrier Services" refers to the market

for the paid ocean transportation to and from the United States of wheeled freight on such ships.

3.      The Defendants engaged in a combination and conspiracy in unreasonable restraint

of trade, which had the effect of fixing, raising or stabilizing the price paid by Plaintiff and the Class

for Vehicle Carrier Service, restricting output and allocating customers, all in violation of Section 1

of the Sherman Act.

4.      Competition authorities in the United States, the European Union, Canada and Japan

have been investigating a possible global cartel among companies providing Vehicle Carrier Services

since at least September 2012 for evidence of collusion.

5.      As a direct result of the anticompetitive and unlawful conduct alleged herein,

Plaintiff and the Class paid artificially inflated prices for Vehicle Carrier Services during the Class

Period from January 1, 2006 through the present.

## II.    JURISDICTION AND VENUE

6.      Plaintiff brings this action under Section 4 of the Clayton Act, 15 U.S.C. § 15, to enjoin Defendants' illegal conduct and to recover treble damages and costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiff and the other members of the Class have suffered as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C, § 1.

7.      The Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 15 and 26 and 18 U.S.C. §§ 1331 and 1337.

8.      Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), and 22 and 28 U.S.C. §§ 1391 (b), (c) and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in or are found or transact business in this District.

9.      The Court has personal jurisdiction over the Defendants because each, either directly or through the ownership or control of its subsidiaries: (a) transacted business in the United States, including in this District; (b) directly sold Vehicle Carrier Services throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; or (d) were engaged in an illegal conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

### III.   INTERSTATE TRADE AND COMMERCE

10.     During the Class Period, Defendants sold substantial quantities of Vehicle Carrier Services.

11. The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce, in that Vehicle Carrier Services were sold to, and purchased by, direct purchasers throughout the United States.

12.     Such effects, including the artificially raised and inflated prices that Plaintiff and members of the proposed Class paid for Vehicle Carrier Services during the Class Period, caused antitrust injury in the United States to Plaintiff and members of the proposed Class, and give rise to their claims under Section 1 of the Sherman Act.

### IV. PARTIES

#### Plaintiff

13.     Plaintiff Cargo Agents, Inc. is a Wyoming corporation with its principal place of business located in Flushing, New York. Plaintiff directly purchased Vehicle Carrier Services from one or more Defendants during the Class Period and was directly injured as a result.

#### Defendants

14.     Defendant Nippon Yusen Kabushiki Kaisha ("NYK Line") is a Japanese company with its principal place of business in Tokyo, Japan. NYK Line, directly or through its wholly-owned and controlled subsidiary, provided, marketed, and sold Vehicle Carrier Services to and from the United States, including in this District, during the Class Period.

15.     Defendant NYK Line (North America) Inc. ("NYK America") is a wholly-owned subsidiary of NYK Line with its principal operations based in Secaucus, New Jersey. NYK

4

America provided, marketed and sold Vehicle Carrier Services to and from the United States, including in this District, during the Class Period.

16.     Defendant Mitsui O.S.K. Lines, Ltd. ("MOL") is a Japanese company with its principal place of business in Tokyo, Japan. MOL, directly or through its wholly-owned and controlled subsidiary, provided, marketed, and sold Vehicle Carrier Services to and from the United States, including in this District, during the Class Period.

17.     Defendant Mitsui O.S.K. Bulk Shipping (USA), Inc. ("MOB") is a U.S.-based subsidiary of MOL with its principal place of business located in Jersey City, New Jersey. MOB provided, marketed and sold Vehicle Carrier Services to and from the United States, including in this District, during the Class Period.

18.     Defendant Kawasaki Kisen Kaisha, Ltd. ("K' Line") is a Japanese company with its principal place of business in Tokyo, Japan. "K" Line, directly or through its wholly-owned and controlled subsidiary, provided, marketed, and sold Vehicle Carrier Services to and from the United States, including in this District, during the Class Period.

19.     Defendant "K" Line America, Inc. ("'K' Line America") is a wholly-owned subsidiary of "K" Line with its principal operations based in Richmond, Virginia. "K" Line America provided, marketed and sold Vehicle Carrier Services to and from the United States, including in this District, during the Class Period.

20.     Defendant EUKOR Car Carriers Inc. ("EUKOR") is a South Korean company with its principal place of business in Seoul, South Korea. EUKOR provided, marketed, and sold Vehicle Carrier Services to and from the United States, including in this District, during the Class Period.

21.     Defendant Wilh. Wilhelmsen Holding ASA, ("WW Holding") is a Norwegian Company with its principal place of business in Baerum, Norway. WW Holding, directly or

through its wholly-owned and controlled subsidiary, provided, marketed, and sold Vehicle Carrier Services to and from the United States, including in this District, during the Class Period.

22.    Defendant Wilh. Wilhelmsen ASA ("WW ASA") is a Norwegian company with its principal place of business in Oslo, Norway. WW ASA, directly or through its wholly-owned and controlled subsidiary, provided, marketed, and sold Vehicle Carrier Services to and from the United States, including in this District, during the Class Period.

23.    Defendant Wallenius Wilhelmsen Logistics ASA ("WWL") is a Norwegian company with its principal place of business in Lysaker, Norway. WWL, directly or through its wholly-owned and controlled subsidiary, provided, marketed, and sold Vehicle Carrier Services to and from the United States, including in this District, during the Class Period.

24.    Defendant Wallenius Wilhelmsen Logistics Americas, LLC, ("WWL America") is a wholly-owned U.S.-based subsidiary of WWL with its principal operations located in Woodcliff Lake, New Jersey. WWL America provided, marketed and sold Vehicle Carrier Services to and from the United States, including in this District, during the Class Period.

25.    Defendant Wallenius Lines AB ("Wallenius Lines") is a Swedish Company with its principal place of business in Stockholm, Sweden. Wallenius Lines, directly or through its wholly-owned and controlled subsidiary, provided, marketed, and sold Vehicle Carrier Services to and from the United States, including in this District, during the Class Period.

26.    Defendant Compañia Sud Americana de Vapores S.A. ("CSAV") is a Chilean company with its principal place of business in Valparaiso, Chile. CSAV, directly or through its wholly-owned and controlled subsidiary, provided, marketed, and sold Vehicle Carrier Services to and from the United States, including in this District, during the Class Period.

27.     Defendant CSAV Agency North America, LLC ("CSAV Agency") is a wholly-owned subsidiary of CSAV, with its principal place of business located in Iselin, New Jersey. CSAV Agency provided, marketed, and sold Vehicle Carrier Services to and from the United States, including in this District, during the Class Period.

28.     Defendant Toyofuji Shipping Co. Ltd. ("Toyofuji") is a Japanese company with its principal place of business in Tokai City, Japan. Toyofuji, directly or through its wholly-owned and controlled subsidiary, provided, marketed, and sold Vehicle Carrier Services to and from the United States, including in this District, during the Class Period.

29.     Defendant Nissan Motor Car Carrier Co., Ltd. ("Nissan MCC") is a Japanese company with its principal place of business in Tokyo, Japan. Nissan MCC, directly or through its wholly-owned and controlled subsidiary, provided, marketed, and sold Vehicle Carrier Services to and from the United States, including in this District, during the Class Period.

## V.     DEFENDANTS' AGENTS AND CO-CONSPIRATORS

30.     Various other individuals, firms, and corporations, not named as defendants herein, may have participated as co-conspirators with Defendants and performed acts and made statements in furtherance of the conspiracy. Plaintiff reserves the right to name subsequently some or all of these persons or entities as defendants.

31.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## VI.   FACTUAL ALLEGATIONS

### A.   Vehicle Carrier Services

32.   Vehicles are transported globally using specialized general cargo vessels called "Roll-on/Roll-off" ships (hereinafter, "Ro-Ro" or "Vehicle Carriers").  As opposed to other types of cargo ships that typically use cranes to load and unload cargo (a.k.a., a "Lift-on, Lift-off" or "LoLo"), a Ro-Ro typically has built-in ramps that enable vehicles to be efficiently "rolled on" and "rolled off" the ship, hence the name.

33.   Vehicle Carriers are used to provide ocean transport for all types of wheeled cargo, including: cars, trucks, boats, buses, motor homes, tractor trailers, cranes, and other high and heavy equipment and machinery.

34.   Ro-Ro shipping to and from the United States is limited to the major shipping ports. According to the U.S. Department of Transportation, Maritime Administration, Vessel Calls Snapshot, 2011 (dated March 2013), New York/New Jersey had the third largest number of Ro-Ro vessel calls (ships docking at port to load or unload cargo) in the United States.

### B.   The Prices For Vehicle Carrier Services During the Class Period Are Consistent with Collusion

35.   Prices for Vehicle Carrier Services have been generally increasing since 2006. Pricing for Vehicle Carrier Services (per vehicle) was relatively flat from 2001 to 2006.  By contrast, prices for Vehicle Carrier Services have increased by approximately 23% from 2006 to 2012, more than the increase in demand during the Class Period. This increase is contrary to what economic principles would predict in a competitive market.  During this period, overall demand for cars and other wheeled vehicles declined, and there was overcapacity in the supply of Vehicle Carrier Services.

8

C.   **The Vehicle Carrier Services Market Structure and Characteristics Plausibly Support the Existence of Collusion**

36.   In addition to the price movements in this industry during the Class Period, several structural and other characteristics of the Vehicle Carrier Services market, including barriers to entry, inelasticity of demand, the commodity-like nature of the services at issue, and the excess capacity in the market, together with Defendants' opportunities to meet and collude, further demonstrate the existence and plausibility of Defendants' conspiracy as alleged herein.

37.   The Vehicle Carrier Services market is highly concentrated. As shown below, the Defendants by capacity represent over two-thirds of the global market:

| Operator | Number of Vessels | Capacity (Cars) |
|---|---|---|
| NYK Line | 104 | 599,897 |
| Mitsui O.S.K. Lines | 83 | 475,809 |
| "K" Line | 79 | 413,134 |
| EUKOR | 78 | 497,455 |
| Wallenius Wilhelmsen Line | 61 | 400,140 |
| Nissan M.C.C. | 11 | 102,370 |
| CSAV | 6 | 29,251 |
| TOYOFUJI | 6 | 34,560 |
| Sub-total | 428 | 2,552,616 |
| Others | 242 | 1,137,644 |
| Total | 670 | 3,690,260 |

Source: Hesnes Shipping AS, *The Car Carrier Market 2012*

### Commodity-Like Services

38.   Vehicle Carrier Services are homogeneous, commodity-like services. Purchasers of Vehicle Carrier Services choose providers almost exclusively based on price, since the qualitative differences among providers are negligible. Thus, providers of Vehicle Carrier Services are essentially interchangeable from the purchasers' perspective.

39.   The homogenous and interchangeable nature of Vehicle Carrier Services makes it easier to create and maintain an unlawful cartel because coordination of conduct and prices, as

well as policing those collusively set prices, is less difficult than if Defendants had distinctive services that could be differentiated based upon features other than price.

### Barriers to Entry

40.    There are substantial barriers to entry into the Vehicle Carrier Services market. A new entrant into the industry would encounter significant hurdles, including multi-million dollar start-up costs associated with acquiring ships and equipment, distribution infrastructure, a skilled labor and sales force, and significant variable costs associated with raw materials, and energy.

41.    In addition, Vehicle Carrier Services are generally conducted on fixed schedules requiring an established system of routes with participants that have long-term relationships. As a result, switching costs for shippers are high, thus creating an additional barrier to entry.

42.    Defendants have increased the average size of the Ro-Ro ships in their fleets, making them less sensitive to fuel prices and creating other economies of scale.

### Demand Inelasticity

43.    Demand for Vehicle Carrier Services is highly inelastic as there are no close substitutes. With the limited exception of certain dual-purpose ships, ships are generally suited for only one type of cargo—*e.g.,* bulk dry goods, liquids, standardized containers, or vehicles. A Ro-Ro is built specifically to transport the large, irregular shapes of wheeled vehicles, and to enable those vehicles to be quickly and efficiently loaded and unloaded from the vessel.

44.    As a result, a price increase in Vehicle Carrier Services does not induce purchasers to use other types of cargo vessels or services. By allowing producers to raise prices without triggering customer substitution and lost sales revenue, inelastic demand facilitates collusion.

**Excess Capacity**

45.     In recent years, the Vehicle Carrier Services market has experienced a supply glut, as evidenced by low Vehicle Carrier fleet utilization rates.

46.     As demonstrated by the chart below, Vehicle Carrier Services had experienced years of nearly-full utilization rates before taking a dramatic plunge in 2008.



Source: RS Platou, *The Platou Report, 2005-2012*

47.     Excess capacity, such as that in the Vehicle Carrier Services market, encourages and facilitates collusion. Moreover, the fact that prices increased and stabilized during the Class Period, despite this supply glut, is indicative of price collusion within the market.

**Opportunity for Conspiratorial Communications**

48.     The shipping industry has been characterized as a "small world" where "many of the key figures ... know each other." Among the key figures are NYK Line president, Yasiuni Kudo, MOL's president, Koichi Muto, and "K" Line's president, Kenichi Kuroya. *Lloyd's List 100 most*

11

*influential people in shipping.*

49.    Defendants are members of several trade associations that provide opportunities to meet under the auspices of legitimate business. These associations—and the meetings, trade shows, and other industry events which stem therefrom—provided Defendants with ample opportunities to meet and conspire, as well as to perform affirmative acts in furtherance of the conspiracy.

50.    The Defendants routinely enter into joint "vessel sharing" or "space charter" agreements. These agreements allow shipping lines to reserve amounts of space or "slots" on one another's ships. Vessel sharing agreements are very common in the international maritime shipping industry. While allegedly entered into to optimize capacity utilization and increase efficiency, these agreements provide an opportunity for Defendants to discuss Vehicle Carrier shipping markets, routes, and rates and to engage in illegal price fixing and customer allocation conspiracies.

**D.    Current Governmental Investigations**

51.    United States, Canadian, Japanese, and European competition authorities have initiated a global, coordinated antitrust investigation concerning the unlawful conspiracy alleged herein.

52.    On September 6, 2012, the JFTC executed raids at the Japanese offices of Defendants NYK Line, MOL, "K" Line, WWL, and EUKOR as part of an investigation into anticompetitive conduct related to Vehicle Carrier Services. Defendant "K" Line confirmed in a statement to its shareholders, as part of its FY 2012 Second Quarter report, that it was visited by a JFTC investigation team on suspicion of violating Japan's Antimonopoly Act in connection with transporting cars and wheeled construction machinery. Defendants NYK Line and MOL further confirmed that their Japanese offices had been searched.

12

53.     On September 7, 2012, The *Japan Daily Press* reported that a JFTC official said the cartel "was formed to deal with the rising fuel charges, personnel costs and shipbuilding expenses." According to the article, "apparently some companies formed smaller groups for specific shipping routes, such as for Europe, North America and other Asian nations" and the three major Japanese firms — NYK Line, "K" Line and MOL — played "a big role in this setup."

54.     Defendant WW ASA confirmed in a press release on September 7, 2012 that it had received a request for information from the Canadian Competition Bureau ("CCB"), and that (i) its subsidiaries, WWL and EUKOR had been visited by the JFTC as part of an investigation related to the Japan Antimonopoly Act; (ii) WWL had received requests for information from the EC, DOJ and CCB; and (iii) EUKOR had received requests for information from the DOJ and the CCB. According to Defendant WW ASA, the purpose of the requests made to WWL and EUKOR "is to ascertain whether there is evidence of any infringement of competition law related to possible price cooperation between carriers and allocation of customers."

55.     On the same day, in coordination with United States and Japanese authorities, the EC carried out additional unannounced inspections at the European offices of several maritime shipping companies suspected of operating a cartel. According to the EC, it carried out the inspections in coordination with United States and Japanese competition authorities, and "ha[d] reasons to believe that the companies concerned may have violated Article 101 of the Treaty on the Functioning of the European Union prohibiting cartels and restrictive business practices."

56.     The *Japanese Business Daily* reported that the shipping affiliates of Toyota Motor Corp., including Defendant ToyoFuji, were also among the companies raided by the JFTC.

57.     Defendant CSAV issued a statement in mid-September, 2012 revealing that its employees had received subpoenas from the DOJ and CCB in connection with the suspected Vehicle Carrier Services cartel. Defendant CSAV stated, "[t]he investigation seeks to inquire into the

existence of antitrust law violations related to cooperation agreements on prices and allocation of clients between car carriers."

58.      The DOJ confirmed shortly after the September 2012 raids that "[w]e are coordinating with the European Commission, the Japanese Fair Trade Commission and other international competition authorities." The DOJ explained that "[t]he antitrust division is investigating the possibility of anticompetitive practices involving the ocean shipping of cars, trucks, construction equipment, and other products."

59.      A grand jury has been convened in Baltimore, Maryland to investigate alleged anticompetitive conduct in the Vehicle Carrier Services market and has issued subpoenae to certain of the Defendants.

## EFFECTS OF THE CONSPIRACY

60.      As a result of their unlawful contract, combination, and conspiracy, Defendants succeeded in restricting output, allocating customers, and fixing, raising, maintaining, or stabilizing prices for Vehicle Carrier Services charged throughout the United States.

61.      Plaintiff and the other Class members have been injured in their business and property because they have paid more for Vehicle Carrier Services than they would have paid in a competitive market. Such injuries are of the type the antitrust laws were designed to prevent and flow directly from Defendants' unlawful conduct.

62.      Defendants' unlawful contract, combination, or conspiracy has had at least the following effects:

(a)      Competition in the market for Vehicle Carrier Services has been restrained;

(b)      Prices paid by Plaintiff and the members of the Class for Vehicle Carrier Services were fixed, stabilized, or maintained at supra-competitive levels

14

throughout the United States;

(c)     Customers and markets for Vehicle Carrier Services were allocated among

Defendants and their co-conspirators;

(d)     Plaintiff and the other members of the Class paid more for Vehicle Carrier

Services than they would have paid in a competitive marketplace, unfettered by

Defendants' and their co-conspirators' collusive activities;

(e)     Price competition regarding the sale of Vehicle Carrier Services was

restrained, suppressed, or eliminated, thus raising the prices of Vehicle

Carrier Services above what they would have been absent Defendants'

actions;

(f)     Direct purchasers of Vehicle Carrier Services have been deprived of the

benefits of free and open competition; and

(g)     As a direct and proximate result of the unlawful combination, contract or

conspiracy, Plaintiff and the members of the Class have been injured and

financially damaged in their businesses and property, in amounts to be

determined.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

63.     Plaintiff and members of the Class did not discover and could not have

discovered through the exercise of reasonable diligence the existence of the conspiracy alleged

herein until September 6, 2012, when the global investigation was first publicly reported.

64.     Prior to September 6, 2012, a reasonable person under the circumstances would

have believed the Vehicle Carrier Services to be a competitive industry and, thus, would not

have been alerted to begin to investigate the legitimacy of Defendants' prices for Vehicle Carrier

Services before that time.

65.    Price-fixing conspiracies are, by their very nature, inherently self-concealing. If a conspiracy is to be successful at fixing prices, the participants must ensure that customers do not discovery the existence of the conspiracy.

66.    Because Defendants' agreements, understandings, and conspiracies were kept secret until September 6, 2012, Plaintiff and members of the Class before that time were unaware of Defendants' unlawful conduct alleged herein, and they did not know before that time that they were paying supra-competitive prices for Vehicle Carrier Services during the Class Period.

67.    Defendants' acts in furtherance of the conspiracy were concealed and carried out in a manner specifically designed to avoid detection.

68.    Accordingly, a reasonable person under the circumstances would not have been alerted to Defendants' conspiracy before September 6, 2012.

69.    Because of the deceptive practices and techniques employed by Defendants and their co-conspirators to avoid detection, Plaintiff and members of the Class could not have discovered the alleged contract, conspiracy, or combination at an earlier date by the exercise of reasonable diligence.

70.    Plaintiff and members of the Class had no knowledge of the alleged conspiracy or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed until September 6, 2012, when reports of the investigations into anti-competitive conduct concerning Vehicle Carrier Services were first publicly disseminated.

71.    None of the facts or information available to Plaintiff and members of the Class, if investigated with reasonable diligence, would have led to the discovery of the conspiracy alleged herein prior to September 6, 2012.

72.    Moreover, Defendants affirmatively concealed (and continue to try and conceal)

16

their conspiracy by falsely claiming that the Vehicle Carrier Services market was competitive and creating the illusion that prices were rising as a result of increased demand and tight supply. For example, Defendants stated:

(a)     "The shipping business is very competitive and is noted for its sensitivity to changes in economic activity." CSAV Annual Report 2010, at pg. 15.

(b)     "CSAV works in a very competitive market, in which variations in global economic growth directly affect the demand for cargo transport." *Id.* at pg. 35.

(c)     "The results of the car-carrying services were severely affected by the fall in global demand seen in 2011... [a]dded to the weak global demand for car carriers and the consequent under-utilization of ships was a sharp rise in oil prices." CSAV Annual Report 2011, at pg. 22.

(d)     "Global automobile marine transport volume was robust through the middle of 2008, resulting in a severe shortage of vessels in the marine transport market, a market in which prices are based on the relationship between supply and demand. As a result, shipping rates were on the increase." NYK Annual Report 2009, at pg. 8.

(e)     "In addition to Japanese marine transport operators, the NYK Group competes with international shipping companies operating throughout the globe, and the competitive situation is growing more intense." NYK Annual Report 2012, at pg. 102.

(f)     "The K Line Group promises to comply with applicable laws, ordinances, rules and spirit of the international community and conduct its corporate activities through fair, transparent and free competition." "K" Line Annual Report 2009, at pg. 1.

(g)    "The K Line Group is doing business in all international markets, and is involved in competition with many shipping companies at home and abroad." "K" Line Annual Report 2008, at g. 55.

(h)    "Through its capital intensity and cyclical nature, the shipping segment has historically represented higher volatility and financial risk than maritime services. The car Ro-Ro shipping has during the recent history also represented the single largest investment area and exposure for the group and its shareholders....Demand for transportation of cars and other cargo has improved significantly, primarily during the second half of the year, and combined with better mix of cargo types this has positively affected the profitability of the fleet." WW ASA Annual Report 2010, at pg. 20-21.

(i)    "Demand for ocean transportation of Ro-Ro Cargo to Oceania remained at low levels through the year, while car volumes rose in the latter half of the year. Trades involving emerging markets such as China, South America, India and Africa offered relatively healthy volumes through most of the year, although fierce competition put significant pressure on rates." WW ASA Annual Report 2009, at pg. 30.

73.    Thus, Defendants and their co-conspirators engaged in a successful anti-competitive conspiracy concerning Vehicle Carrier Services, which they affirmatively concealed.

74.    By reason of the foregoing, the running of any statute of limitations has been tolled with respect to the claims that Plaintiff and members of the Class have alleged in this Complaint.

## VII.   CLASS ACTION ALLEGATIONS

75.     Plaintiff brings this action on behalf of itself and as a class action under the

Federal Rules of Civil Procedure Rule 23(a), (b)(2) and (b)(3) on behalf of the following Class (the

"Class"):

> All persons and entities that purchased Vehicle Carrier Services
> to or from the United States directly from any Defendant (or
> any current or former subsidiary or affiliate thereof) or any of
> Defendants' agents or co-conspirators between January 1, 2006
> and the present. This Class excludes Defendants, their agents
> and co-conspirators, and the present and former parents,
> predecessors, subsidiaries and affiliates of the foregoing, and
> federal and state governmental entities and instrumentalities.

76.     Plaintiff believes that there are thousands of Class members throughout the United

States, the exact number and their identities being known by Defendants, making the Class so numerous

and geographically dispersed that joinder of all members is impracticable.

77.     There are questions of law and fact common to the Class, which questions relate

to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a

result thereof, including, but not limited to:

a      Whether Defendants and their co-conspirators engaged in a combination and

conspiracy among themselves to fix, raise, maintain or stabilize prices for Vehicle Carrier Services

or engaged in output restrictions and market allocation for these services sold in the United States;

b.      The identity of the participants in the conspiracy;

c.      The duration of the conspiracy alleged in this Complaint and the nature and

character of the acts performed by Defendants and their agents and co-conspirators in furtherance of the

conspiracy;

d.      Whether the alleged conspiracy violated Section 1 of the Sherman Act;

e.      Whether the conduct of Defendants and their agents and co-conspirators, as

19

alleged in this Complaint, caused injury to the business and property of Plaintiff and other members of the Class;

   f. The effect of Defendants' conspiracy on the prices of Vehicle Carrier Services sold in the United States during the Class Period; and

   g. The appropriate measure of damages sustained by Plaintiff and other members of the Class.

  78. Plaintiff is a direct purchaser of Vehicle Carrier Services and its interests are coincident with and not antagonistic to those of the other members of the Class. Plaintiff is a member of the Class, has claims that are typical of the claims of the Class members, and will fairly and adequately protect the interests of the members of the Class. In addition, Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

  79. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

  80. Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

  81. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

  82. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would engender. The Class is readily definable through the files of Defendants and their co-conspirators, and prosecution as a class action will eliminate the possibility of repetitious

litigation. Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## CAUSE OF ACTION

### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)

83.     Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

84.     Beginning at least as early as January 1, 2006, and continuing through the present, Defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, have engaged in a continuing agreement, understanding, and conspiracy to unreasonably restrain trade in the Vehicle Carrier Services market in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

85.     The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize, or maintain prices at artificially supra-competitive level for Vehicle Carrier Services, and to restrict output and allocate customers for Vehicle Carrier Services in the United States.

86.     Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to restrict output and allocate customers with respect to Vehicle Carrier Services.

87.     As a direct and proximate result of Defendants' unlawful conduct, competition in the Vehicle Carrier Services market was successfully restrained, and Plaintiff and Class members were injured by having paid more for Vehicle Carrier Services than they would have paid absent Defendants' unlawful conduct. Such injuries are of the type the antitrust laws were

designed to prevent and flow directly from Defendants' unlawful conduct.

88.    Accordingly, Plaintiff and Class members seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a)    That the Court certify this action as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure;

b)    That the Court declare Defendants' contract, combination, and conspiracy to have violated Section 1 of the Sherman Act, which violations injured Plaintiff and the Class members in their business and property;

c)    That Plaintiff and the Class members recover damages, as provided under the federal antitrust laws, and that a joint and several judgment in their favor be entered against Defendants in an amount to be trebled in accordance with such laws;

d)    That Plaintiff and the Class members recover their costs of the suit, including reasonable attorneys' fees, as provided by law;

e)    That Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and their respective officers, directors, partners, agents, employees, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing the conspiracy alleged in this

Complaint; and

f)   That the Court direct further relief as it may deem just and proper.

Dated: New York, New York
October 11, 2013

Respectfully submitted,

KAPLAN FOX & KILSHEIMER LLP

By: _Gregory K. Arenson_

Robert N. Kaplan
Richard J. Kilsheimer
Gregory K. Arenson
850 Third Avenue, 14th Floor
New York, New York 10022
Tel: (212) 687-1980
rkaplan@kaplanfox.com
rkilsheimer@kaplanfox.com
garenson@kaplanfox.com

*Attorneys for Plaintiff*
*Cargo Agents, Inc.*